# CHARLESTON.

SUSIE M. BAILEY *et al.* v. JOHN J. TRIPLETT *et al.*

Submitted January 14, 1919.   Decided January 21, 1919.

1. ARBITRATION AND AWARD—*Validity.*

   In making an award upon matters in controversy arbitrators are bound by the terms of the agreement submitting the questions to them. Such agreement is their charter of authority and if they make an award which violates or disregards some of the terms thereof, the same will not be upheld. (p. 174).

2. SAME—*Authority of Arbitrators.*

   Where, in an agreement submitting to the determination of arbitrators the proper location of a disputed boundary line, the parties agree upon the method to be pursued in order for the proper location of such line, neither such arbitrators nor an umpire selected by them, in case they fail to agree, have authority to make an award arrived at by disregarding the agreements of the parties as to the method of solving the dispute, and substituting for such agreement in this regard the opinion of the arbitrators or the umpire as to the proper method therefor. (p. 174).

3. SAME—*Confirmation of Award.*

   Where the proper location of a disputed boundary line is submitted by the interested parties to arbitrators, with the provision that in case of their disagreement an umpire selected by them shall make the award, and they do disagree, and such umpire so selected makes an award in the alternative finding that in his judgment the disputed boundary line properly located is ·at a certain place, but that if he follows the directions contained

in the agreement signed by the parties the disputed boundary line is at a certain other place, the circuit court, upon being asked to enter judgment upon such award, will disregard the award made by the umpire based on his own opinion, and will enter judgment confirming that award made in accordance with the methods agreed upon by the parties for the location of the disputed line, in the absence of fraud, mistake or adventitious circumstances.    (p. 179).

Error to Circuit Court, Mineral County.

Arbitration agreement entered of record, in circuit court between Susie M. Bailey and others and John J. Triplett and others for the determination of a disputed boundary line.    From a judgment disregarding the umpire's award on his own opinion and confirming his award in the alternative according to directions contained in articles of submission, John J. Triplett and others bring error.

*Affirmed and remanded.*

*W. H. Griffith* and *R. A. Welch,* for plaintiffs in error.
*W. C. Grimes,* for defendants in error.

RITZ, JUDGE:

On the 6th day of March, 1789, James Dawson procured a patent for a tract containing three hundred and ninety-six and three-fourths (396 3/4) acres of land.    This land is bounded by four lines of equal length, to-wit, two hundred and fifty-two poles each, intersecting each other at right angles, thus making a tract of land in the form of a square. Dawson conveyed the land to Thomas Bond in the year 1792. In the year 1801 Thomas Bond conveyed a part of this tract of land to one Edward McCarty.    The part so conveyed was the northwestern portion thereof, and was separated from that remaining by a straight line running from a point in the southern line of the original tract seventy poles from the south-west corner thereof, to a point in the northern line of said tract at a distance of twelve poles from the north-east corner thereof.    The description in the deed to McCarty gives slightly changed courses from those contained in the original patent.    The description of the three hundred and ninety-six and three-fourth-acre tract in the original patent

is as follows: "Beginning at a hickory, corner to O'Neal; thence N. 88° E. 252 poles; thence N. 2° W. 252 poles; thence S. 88° W. 252 poles; thence S. 2° E. 252 poles to the beginning." The beginning corner which is referred to as a hickory, corner to O'Neal, is established and is not in dispute. The land conveyed by Bond to Edward McCarty in 1801 is described in the deed as follows: "Beginning at a hoopwood tree standing by a point of rocks about 20 poles E. from the North Branch of the Potomac River and corner to Nicholas Seaver; thence with his line N. 85° E. 70 poles to the three chestnut oaks on the ridge called Bond Ridge; thence with the top of said ridge N. 40° E. 86 poles to a large white oak in a hollow, the same course continued N. 296 poles to two small hickories on the side of a hill in John Ravenscraft's line; thence with it S. 85° W. 240 poles to his corner; thence S. 252 poles to the beginning." The point referred to in this description as the beginning corner is the same as the beginning corner referred to in the patent to Dawson, and is not in dispute. The next corner called for on top of Bond Ridge is likewise not in dispute, and it is the location of the line extending from this corner, being the next line referred to in the description, that is disputed. The Tripletts now own the southern part of the land conveyed to McCarty by the deed of 1801, and the Baileys own the land which was retained by Bond when he made the deed to McCarty, which is the land lying south-east of the disputed line. It will be observed that the Tripletts do not own the land along the entire course of this line, but its correct location solves the matter in dispute between the parties. It will likewise be observed that the line called for in the McCarty deed corresponding to the line in the Dawson patent with a course of N. 88° E. has a course N. 85° E., and that the other corresponding lines have this variation of 3°. The parties not desiring to resort to litigation in the establishment of the disputed line entered into an agreement by which they submitted the question of its location to the determination of two surveyors mentioned in the agreement, and provided further that if the arbitrators did not agree that they should select an umpire, and that

this award should be final and binding on the parties, and should be entered as the judgment of the Circuit Court of Mineral County. This agreement was entered upon the records of the circuit court of Mineral county, and the arbitrators proceeded to act under it. They failed to agree and selected an umpire. This umpire made an award finding that in his opinoin the true location of the line was as found by arbitrator Harr, and which is the line contended for by the Tripletts, but he also found that if this line was to be located in the manner pointed out in the arbitration agreement, that is, by locating the northern end of it, and then running a straight line between that point and the point agreed on as the other end of the division line, it was as located by arbitrator Hott. This award was presented to the circuit court of Mineral county, and that court asked to enter a judgment thereon. The court took the view that the terms of the agreement directing the arbitrators how the northern end of the disputed line should be ascertained were final and binding upon the arbitrators, and that they could not depart from these terms. He therefore disregarded the award made by the umpire based on what he believed to be the correct line and entered a judgment on the alternative award fixing the location of the line by following the directions contained in the articles of submission, and from this judgment this writ of error is prosecuted.

The agreement of submission contains certain stipulations of the parties as to how the arbitrators selected by them shall determine the proper location of the disputed line. The provisions of the agreement in this regard which are pertinent to this discussion are as follows: "It is further mutually agreed that the southwest corner of the lands now owned by the said John J. Triplett and Nannie Triplett, which corner was formerly known as the "O'Neal Corner" and also as the "Nicholas Seavers Corner," now the corner of said Triplett to Alkire and Ravenscraft, (and described in deed from Bond to McCarty, as "Beginning at a hoop wood tree, standing by a point of rocks about twenty poles E from North Branch of the Potomac") is the recognized and established corner of the said patent made to

said James Dawson; and the corner on top of Bond's Ridge, in line of original survey, N. 85 E. 70 poles from said southwest corner of said original survey, according to the calls of said conveyance from Thomas Bond to Edward McCarty, July 10, 1801, is now a recognized, established and undisputed corner, the beginning of said line in dispute between said lands and which line is to be established hereunder.

For the further aiding and guiding the said surveyors, it is mutually agreed that the following lines shall, for the purposes hereunder, be recognized and treated as fully established lines of the original survey, patented to James Dawson, March 6, 1789.

Beginning at the southwest corner of said patent, the corner hereinbefore described and recognized as the undisputed southwest corner of the said Triplett lands, and running thence N. 88 E. 252 poles, according to the calls of said original survey of said patent, at the end of which distance, only for the purpose hereof, a corner shall be treated as fully established and recognized, according as the survey made by said arbitrators may show; thence N. 2 W. 252 poles, according to calls of said patent to said James Dawson, to a corner of said original survey, probably now gone, but for the purpose contained herein, shall be recognized and fully established as the northeast corner of said patent to said James Dawson, according as the survey of said arbitrators may show; thence S. 88 W. 252 poles at the end of which distance shall be treated as the fully established and recognized northwest corner of the said patent, for the purposes contained herein; thence S. 2 E. 252 poles to the beginning; and for the purposes of establishing said boundary or division line in dispute between the parties hereto, it is mutually agreed that beginning at said northeast corner of said patent, running thence, according to calls of said original survey of said patent, S. 88 W. 12 poles, and S. 85 W. 240 poles, reversed, according to the calls of said deed from Thomas Bond to said Edward McCarty, from the northwest corner of said patent, in the line of said original survey, is the end of said original boundary or division line in dispute between the lands of the parties hereto, and which

line is described in deed from Thomas Bond to Edward McCarty, which deed is dated July 10, 1801, and of record in Deed Book No. 12, page 340, Hampshire County Records, as follows:

(Beginning) "to three chestnut oaks, on a ridge called Bond's Ridge, thence with the top of said ridge N. 40 E. 86 poles to a large white oak in a hollow, the same course continued all 296 poles to two small hickories, on the side of hill in John Ravenscraft's line."

It is further agreed that for the purpose of making and surveying any of said lines necessary to be surveyed and establishing any corner necessary to be established, in order to properly and truly locate said boundary or division line in dispute, the following rules shall govern said surveyors: First,—Recognized and established, natural and artificial monuments, corners and marked lines, shall govern over courses and distances. Second,—Where natural monuments or marked lines do not exist or cannot be established, the course and distances called for shall govern, except. Third,— In determining lost corners or lines, the lost lines shall be run according to courses and distances in the original survey, unless the lines so run do not close the survey with the corners remaining, in which case the courses shall be followed, and distances disregarded, but if the original survey cannot be made to close the courses shall be deviated from so as to make said survey close according to the right and the true intent of said survey; and the gap, if any, shall be closed as seems most consistent with all the calls."

It will be seen from the part of the agreement thus quoted that the parties thereto fixed upon the means which the arbitrators should use in determining the disputed line, and that was to begin at the recognized corner, being the south-west corner of the Dawson patent, as well as the south-west corner of the Triplett land, and then run a line 252 poles on the course contained in the Dawson patent, which point, for the purpose of locating the line in dispute, was to be treated as the south-east corner of the Dawson patent; thence to proceed from that point upon the course called for in the Dawson patent, a distance of 252 poles, which point should be considered, for the purpose

of locating the disputed line, as the north-east corner of the Dawson patent, and so running around the Dawson patent upon the courses and for the distance therein contained, and the corners thereof located in this way were to be treated as the true corners of that patent for the purpose of the arbitration. Then, for the purpose of locating the northern end of the disputed line, it was agreed that the arbitrators should start from the north-east corner of the Dawson patent as above located, and run with the courses given in the Dawson patent, to-wit, S. 88° W. 12 poles, at the end of which 12-pole line would be the northern end of the line in dispute, and which point is to be 240 poles on the course S. 85 W. reversed from the north-west corner of the McCarty land. It will be observed from this that the agreement of the parties was that the northern end of the line in dispute was in the northern line of the Dawson patent at a point twelve poles from the northeastern corner of said patent, and all that was necessary for the arbitrators to do to carry out the agreement was to locate the lines of the Dawson patent, then to locate a point twelve poles west from the north-eastern corner thereof and fix this as the northern end of the line in dispute, and run a straight line from that point to the beginning of the division line between the parties, and so much of this line as separated the lands of the one party from the other would be the line agreed upon. One of the awards made by the umpire in this case was made in this way, and this is the one which the court adopted. The other award made by the umpire is based upon evidence taken before him, and by other facts which he observed upon the ground to the entire disregard of the directions contained in the agreement of the parties as to the manner of ascertaining and locating the disputed line, and the only question is whether the arbitrators, or rather the umpire, had any authority to locate any line except as directed by the agreement of submission, and second, if he did not, whether the court could enter a judgment upon such an alternative finding, or whether all of the findings of the umpire should have been entirely disregarded and the parties left to settle the dispute some other way. The agreement of submission entered into by

the parties is the authority for the arbitrators and the um-
pire to act. Without that anything that they do is entirely
without authority. It · is their charter of authority, and
can it be said that where matters in dispute are submitted
to them for determination they have authority to decide
that dispute in any manner which they see fit, in utter dis-
regard of the provisions of the ˙agreement of submission?
Where the· parties themselves agree upon the manner of
the submission of the dispute and upon what shall be con-
sidered by the arbitrators, and what shall be done by them
in order to a settlement of the dispute, it is part of the
agreement, and is as binding upon the arbitrators as any
other part, and they have no authority to make an award
in violation of, or not in accordance with such stipulations.
Such an award cannot be binding upon the parties, and
would be entirely beyond the authority given to the arbi-
trators. In 5 Cor. Jur. at p. 126, it is said: ''To adopt a
different rule of decision from that which the terms of the
authority require the arbitrators to apply is as much a de-
parture from the submission as to pass upon a matter not
submitted, or to omit to consider a matter embraced in the
submission.'' It is also laid down in 2 R. C. L. p. 374, that
the powers and duties of arbitrators are determined by the
order of submission. Where the ·parties themselves limit
the arbitrators in the manner of their proceeding, such lim-
rtations in the agreement of submission are as binding upon
the arbitrators as any other provision of the agreement. So
in *Insurance Company* v. *Board of Education,* 49 W. Va.
360, it is held that arbitrators cannot act beyond the au-
thority conferred by the submission, and if they do so any
award made will not bind the parties. In *Goff* v. *Goff,* 78
W. Va. 423, which was a cause submitted to arbitration for
the purpose of determining a disputed line, it was held that
where the agreement of submission provided that the arbi-
trators should determine the line by the deeds and other evi-
dence deemed necessary to enable them to arrive at a just
and fair settlement, they were not authorized to determine
such dispute in such manner as they may deem just and fair,
but that they must determine it in accordance with the title

papers of the parties and the evidence submitted to them, as provided in the order of submission. Similar holdings are found in the cases of *Matthews* v. *Miller*, 25 W. Va. 817; *Austen* v. *Clark*, 8 W. Va. 236; *Dunlap* v. *Campbell*, 5 W. Va. 195; and *Swan* v. *Deem*, 4 W. Va. 368. We are clearly of the opinion that the agreement of the parties as to the methods to be pursued by the arbitrators and the umpire in locating the disputed line is as binding upon them in doing the work as any other part of the agreement, and that the parties could not be bound by any award not made in accordance therewith. There is no real dispute in this case, but that the conclusion adopted by the judgment of the court is the only one which can be reached by following the directions given in the agreement of submission, but one of the arbitrators does not agree that that is the proper way to locate the disputed line, and declined to agree to it for that reason. This necessitated the appointment of the umpire. The umpire was likewise of the opinion that the agreement made by the parties as to how the line should be fixed and determined was not the proper way for deciding it, but he, as before stated, in addition to finding this also found as an alternative award that if the agreement in this particular was binding upon the arbitrators then the line finally established by the circuit court of Mineral county is the true division line. Much evidence was taken tending to show that the other line is the correct one. This evidence was all improper and immaterial. There is no showing that any fraud was practised upon either of the parties in entering into the agreement to submit the question to arbitrators. They were anxious to get the line in dispute between them settled, and without knowing just where the same would run on the ground they, from the title papers and the information they possessed, freely and fairly entered into the agreement. The policy of the law is to settle disputes by arbitration, and when contending parties submit a matter of this character, or of any other character, to arbitrators for the purpose of determining their differences, and agree upon the method to be pursued by such arbitrators, and there is no fraud or mistake in the making of such agreement, an

award made thereunder will be final and binding upon the parties. On the other hand, an award made in disregard of the agreement entered into, even though it may be the opinion of the arbitrators that such is the correct solution of the matters submitted to them, will be set aside as having no authority for its basis.

Attention is called to the fact that it is impossible to form the northern line of the Dawson patent in the manner indicated in the agreemnt of arbitration, for the reason that the twelve-pole line therein referred to is on a course of S. 88 W. 12 poles, while the continuation of the line to the north-west corner of the McCarty line is on a course of S. 85 W. 240 poles. This is quite true, but it will also be observed that it is provided that in case the original survey could not be made to close on the courses given, the gap should be closed as seems most consistent with all the courses. It is apparent that the intention of the parties was to locate the lines of the Dawson patent and to fix the northern line of that patent as a monument in which the northern end of the disputed line would be found at a point twelve poles from its eastern end, and 240 poles from its western end, and the only way to fix this line was to make the course S. 85 W., which is the course given in the Mc-Carty deed, correspond with the course of the corresponding line of the original patent, and this was what the umpire did in his alternative award.

It is also contended that to locate the line in dispute as it was located by the circuit court of Mineral county changes the course given in the McCarty deed. This is true, but it is likewise true that it is provided in their submission that where a monument was called for by their agreement courses and distances must yield to such monument. The point in the northern line of the Dawson patent is a monument when that northern line is fixed and established. *Vandale* v. *Casto*, 81 W. Va. 76. So that when the northern line of the Dawson patent was fixed in the manner pointed out by the parties in their agreement, it became a monument, and their agreement that the northern end of this disputed line should be in this northern line of the Dawson

patent at a point twelve poles from its eastern end made it necessary to change the course given in the McCarty deed for the disputed line, which was done, not only in accordance with the terms of the agreement of the parties that such should be the case where such a contention arose, but also in accordance with the law governing the question of reconciling contradictory descriptions in deeds.

In view of the fact, however, that the umpire made two awards, and made their validity depend upon whether the court came to the conclusion that the parties were bound by the stipulations of the agreement of submission, did the circuit court of Mineral county have the authority to adopt that one of such awards that was in accordance with the terms of the agreement of the parties? We think the court not only had the power, but that it was his duty to disregard the award confessedly made in violation of the agreement entered into and adopt the other award made by the umpire as the only one which had a real basis for its existence. This was the course taken by the circuit court which we think was clearly right.

We, therefore, affirm the judgment complained of and remand the cause to the circuit court of Mineral county in order that said judgment may be executed.

*Affirmed and remanded.*